## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **YVONNE HOWZE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:11-CV-52-VEH** |
| | ) |
| **JEFFERSON COUNTY** | ) |
| **COMMITTEE, FOR ECONOMIC** | ) |
| **OPPORTUNITY ("JCCEO"), et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## <u>MEMORANDUM OPINION</u>

## I.    INTRODUCTION

Plaintiff Yvonne Howze ("Howze" or "Plaintiff") initiated this job discrimination action against her former employer, Defendant Jefferson County Committee for Economic Opportunity ("JCCEO") and other individual Defendants associated with the JCCEO.[1]  (Complt., Doc. 1).  Howze maintains that the JCCEO terminated her because of her hearing disability and because of her age.  (*Id.* at 5). Against the JCCEO, therefore, she brings claims under the Americans with

---

[1]  In addition to suing her employer, the JCCEO, Howze additionally named as Defendants the following individuals: Rev. T.L. Lewis ("Lewis"), President of the JCCEO Board of Directors; Gayle Cunningham ("Cunningham"), Executive Director of the JCCEO; Theodore Debro, Jr. ("Debro"), Deputy Director of the JCCEO; and Geraldine Collins ("Collins"), JCCEO's Personnel Manager.  (Complt., Doc. 1 at 3-4).

Disabilities Act, as amended ("ADAAA"), 42 U.S.C. §12101 *et seq.* and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §701 *et seq*. ("Count I"); the Age Discrimination in Employment Act ("ADEA"), and the Alabama Age Discrimination in Employment Act ("AADEA") ("Count II"); as well as state law claims for intentional infliction of emotional distress ("Count III") and for negligence in hiring, training, supervision and retention ("Count IV").  Against the individual Defendants and the JCCEO, she also states a claim for outrage under state law ("Count V").

Pending before the court is the Motion for Summary Judgment (Doc. 22) (the "Motion") jointly filed by all Defendants.  Defendants contend that they are entitled to summary judgment in their favor as to all claims asserted against them in Howze's Complaint.  Howze filed her response in opposition (Doc. 23), and the Defendants filed their reply (Doc. 24).  The matters have been fully briefed, the Motion is now ripe for determination. The court has carefully considered the Motion, the parties' arguments, the factual record in the light most favorable to the Plaintiff, and the relevant law.  For the reasons explained below, the Motion is due to be granted in part and denied in part.

## II.   LEGAL STANDARDS

### A.   Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper only

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[2] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

---

[2] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to FED. R. CIV. P. 56 (2007 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

for the nonmoving party." *Anderson*, 477 U.S. at 258. "If the evidence [presented by the nonmoving party to rebut the moving party's evidence] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249 (internal citations omitted).

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by presenting positive evidence that demonstrates the absence of a genuine issue of material fact; i.e., facts that would entitle it to a directed verdict if not controverted at trial. *Id.* at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial. *Id.*

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial. *Id.* at 1116. Once the moving party satisfies its burden using this method, the nonmoving

4

party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.  *Id.*

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the nonmoving party on the issue in question.  *Id.*  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the nonmoving party's case.  *Id.* at 1115-16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *Id.* at 1116-17.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

**B.    Employment Discrimination Generally**

A plaintiff in an employment discrimination case maintains the ultimate burden

of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases in which there is no direct evidence of discrimination. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[3]

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient

---

[3] As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 782 (11th Cir. 1989) (footnote omitted).

evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though the defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

## C.    ADEA Discrimination

Special standards govern age discrimination cases.  The ADEA provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  To fall under the ADEA's protections, an employee must be "at least 40 years of age[,]" 29 U.S.C. § 631(a), and the plaintiff "retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action."[4] *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343,

---

[4]  The *Gross* "but-for" standard is distinguishable from the "motivating factor" standard that applies in Title VII and other discrimination lawsuits. In *Gross*, the Supreme Court held that:

> [A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but for' cause of the challenged employer action.  The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision.

*Id.* at 2352.  Further, the Eleventh Circuit has determined that *Gross* does not overrule the *McDonnell-Douglass* framework for circumstantial evidence age discrimination cases; therefore, courts are to apply both standards.  *See, e.g., Vahey v. Philips Electronics N. Am. Corp.*, 461 F.

2351 (2009) (emphasis added).

The Eleventh Circuit "has adopted a variation" of the *prima facie* case standard articulated by the Supreme Court for Title VII claims in *McDonnell Douglas* for cases arising under the ADEA. *Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 566 (11th Cir.1992). "Under this variation of the *McDonnell Douglas* test for establishing a *prima facie* case of discrimination, the plaintiff must show that he (1) was a member of the protected group of persons between the ages of 40 and 70, (2) was subject to adverse employment action, (3) was replaced with [or not selected for a position over] a person outside the protected group, and (4) was qualified to do the job." *Mitchell*, 967 F.2d at 566 (citation omitted); *see also Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998) ("To establish his *prima facie* case of discriminatory failure to promote, Standard must show that (1) he was in a protected group; (2) he was not given the promotion; (3) he was qualified for the position and (4) someone outside of the protected group was given the position.") (citation omitted).

"If this is done, the defendant has the burden of going forward and articulating

App'x 873, 874 (11th Cir. 2012) ("Because the Supreme Court did not overrule this precedent in *Gross*, we review Vahey's claims under both *McDonnell Douglas* and *Gross*."); *Thomas v. Humana Health Plan, Inc.*, 457 F. App'x 819, 821-22 (11th Cir. 2012) ("Accordingly, we analyze Thomas's age discrimination claims under both the *Gross* test and the *McDonnell Douglas* test.").

a legitimate, non-discriminatory rationale for the [adverse employment action]."
*Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).
"Finally, if the defendant rebuts the presumption of discrimination, the plaintiff must
prove by a preponderance of the evidence that the employer's asserted reason is
merely a pretext for a discriminatory [action]." *Id.* (footnote omitted).

## III.   FACTUAL BACKGROUND[5]

### A.   The JCCEO and its Programs

The JCCEO is a non-profit agency that, by its very nature, is dependent on
grant funding.  The agency's practice has been to reassign program coordinators to
another grant-funded program whenever their program's funding is terminated. (Doc.
23-1 at 11).

One such grant-funded program operated by the JCCEO is the Homelessness
Prevention and Rapid Re-Housing Program ("HPRP").  The HPRP helps local

---

[5]  Keeping in mind that when deciding a motion for summary judgment the court must
view the evidence and all factual inferences in the light most favorable to the party opposing the
motion, the court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel
Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection
with summary judgment, a court must review all facts and inferences in a light most favorable to
the non-moving party). This statement does not represent actual findings of fact.  *See In re
Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the court has provided this
statement simply to place the court's legal analysis in the context of this particular case or
controversy.  Further, due to the nature of this court's decision on summary judgment, the
foregoing statement of facts is limited in scope. More specifically, facts that are not material to
the court's ruling on summary judgment have not been included in this background.

residents who are in jeopardy of losing their home (in an effort to prevent them from becoming homeless) and individuals who have already lost their home (in an effort to mitigate their situation and get them back into a stable housing environment).  The original funding source for the grants supporting the HPRP comes from the federal government and is administered by the U.S. Department of Housing and Urban Development ("HUD").  HUD provides funding to the State of Alabama, Jefferson County, and the City of Birmingham, each of which participated in making grants to the JCCEO to administer the HPRP. (Debro Aff. ¶¶ 7,8).  Accordingly, strict rules and procedures are implemented by the federal government, the State of Alabama, Jefferson County, and the City of Birmingham concerning implementation of the HPRP and reporting program activity.  For instance, potential recipients of assistance must meet specific criteria set forth by the funding sources.  These criteria include verifying appropriate residency.[6]

The HPRP program is not intended to provide assistance to all homeless or potentially homeless persons.  Instead, it is targeted at a specific population, which is defined by the applicable criteria. Properly verifying that individuals are qualified

---

[6] For example, County funds could only be used to assist individuals with verified residency in unincorporated Jefferson County.  City of Birmingham funds could only be used to assist persons with verified residency within the City limits of Birmingham.  There are also several other qualifying criteria that must be verified for an individual to receive assistance.

to receive HPRP assistance and that they meet the criteria is critical to the success of the program. (Debro Aff. ¶ 8). As part of administering the program, the HPRP is also required to input data with respect to applicants and recipients of aid into various databases, including a national homeless database, which allows the federal government and other entities involved in the national continuum of care to monitor the homelessness issue and judge the success of various programs designed to combat this issue. Proper, timely and accurate entry of the data into these databases is critical to the success of the program. (Debro Aff. ¶ 9).

### B.    Howze's Employment History

Debro, Deputy Director of the Community Services Division of the JCCEO, was responsible for initially hiring Howze to work for the JCCEO. (Debro Aff. ¶ 3). Howze worked for the JCCEO as an employee at will in various capacities for 11 years until she was terminated by Debro in April 2010. (Howze Depo. at 68; 242-43).

During her employment with the JCCEO, Howze was assigned to several different programs. (Howze Aff. ¶ 4). At all times, she worked under the immediate supervision of Debro, who became a family friend after Howze started working for him. (Howze Depo. at 47, 68). Howze and Debro would socialize together with their families during her employment with the JCCEO. (*Id*).

Howze's last job title with the JCCEO was Coordinator of the HPRP. (Debro

Aff. ¶ 4; Howze Depo. at 242-43).   In her role as HPRP Coordinator, Howze acknowledges that properly screening and qualifying applicants and making sure that they met the funding criteria was vitally important to the program's success.   She further acknowledges that failure to  properly administer the program could expose Debro and Gayle Cunningham, the Executive Director, to criminal prosecution. Howze acknowledges that it was her responsibility to ensure compliance to avoid such consequences.  (Howze Depo. at 28-29).

Howze began working in the role of HPRP Coordinator, which was a newly created position when she was assigned to the role, sometime in the fall of 2009.[7]

## C.    Difficulties Implementing HPRP Procedures

According to Howze, the HPRP was still in the developmental stages of its implementation as late as December 30, 2009.  (Howze Aff. ¶ 10).  As such, she was "constantly being asked to review, revise and change the procedures." (*Id.*).  She also encountered frustrations in implementation due to the HPRP's lack of access to the reporting system in their office, which caused them to rely on outside sources to complete the reporting process.  Debro shared in these frustrations, as evidenced by his e-mail to the executive director of a partner agency ("MSBH") on December 31,

---

[7]  Howze does not recall exactly when she started working as HPRP Coordinator, but believes it was not until October 1, 2009.  Debro contends that she assumed the position in September 2009.

2009, which raised "several concerns" and stated that "MBSH is handicapping much of the HPRP progress at this point" because of delays by MBSH in producing the required reports.  (Doc. 23, Ex. F).  Debro's e-mail inquired about a report required by Jefferson County that was two weeks overdue.  Specifically, the e-mail, directed to Michelle Farley, Executive Director of MBSH, stated:

> The report required by the County was the report that you said you would submit through HMIS, E-snaps? The report was due two weeks ago. There should not have been any activity during this period, but a report was not submitted. I just need us to come to some type of understanding of who will submit and when the reports will be submitted. This is a learning process and somethings (sic) we don't know to answer or we don't know how to act until it happens. The failure to report has happened and we need to deal with it pronto.

(*Id.*).  In Michelle Farley's return e-mail to Debro, she agreed, in relation to the reporting procedures, that "this is a learning process, but it is a certainly a frustration for MBSH that the learning process has been as slow and labored as it has been." (*Id.*).

### D.    Circumstances Surrounding Howze's Termination

Howze recalls that, sometime in 2009, Debro started making remarks about getting "new blood" and younger employees to work for the JCCEO.  (Howze Depo. at 167).   For instance, she remembers him saying that the JCCEO had good employees, but that they were all old, and that he wanted to surround himself with

13

"young blood" and "new ideas." (Howze Depo. at 168-69).  She says he made those type of comments on three or four occasions, and that she started taking offense to the statements in April 2010.  (Howze Depo. at 172).  Howze testified that she knew of no one else who had witnessed those type of statements, but that Debro made those type of comments to her directly and repeatedly.  (Howze Depo. at 169).  Howze said, "I knew [Debro] was serious about it when he made the move to move older people out of his office.  He said he wanted young blood around him."  (Howze Depo. at 170).  The office maneuvering Howze referenced relates to her testimony that three JCCEO employees "who were 50 or close to 50 and above" and considered "old" by Debro – Shirley Hill, Nadine Smith, and Rae Patterson – were moved from Debro's office to other buildings sometime in 2009 or early 2010, "and that their move was accompanied with his statement that he wanted young blood around him."  (Howze Depo. at 208-10).  Howze also recalled that one day when she was apparently squinting after looking at the computer monitor for a long time, Debro said to her, "Well, the first to go is the eyes, then the hearing, then the hair and then the sex." (Howze Depo. at 171).

On April 13, 2010, Debro sent a letter to Howze that addressed three areas of

inadequate job performance.  (Doc. 11, Ex. D).[8]  Howze describes this letter as the beginning of Debro's "paper trail" against her, building his case for her termination, because, as she testified, "Mr. Debro would only terminate if he has documentation." (Howze Depo. at 193).   The letter identified Howze's (1) delay in application processing and payment to providers for services rendered, (2) inconsistent and vague application of guidelines, rules, and regulations for services, and (3) a "[h]igh potential of service providers withdrawing from the program as partners."  (Doc. 22, Ex. D).  The letter concluded by saying, "I will make a decision by Friday, April 16, 2010 on ways to correct this problem.  I am open to receive a suggested corrective action plan from you as coordinator before my decision is made."  (*Id.*).  However, Howze did not submit a suggested corrective action plan because she understood that Debro was going to "get back with [her]" and that they would have a meeting. (Howze Depo. at 190).

The corrective meeting never occurred.  Instead, Jefferson County pulled its funding from the HPRP and announced on the local news that it was withdrawing funding because it had not received the required HPRP reports for months.  (Howze Depo. at 192).  Following the news conference, Debro decided to terminate Howze,

---

[8]  Howze contends that "Debro never counseled, admonished or reprimanded [her] for any reason" prior to the April 13, 2010, letter.  (Howze Aff. ¶ 19).

and he memorialized that decision in a latter dated April 22, 2010.  (Doc. 22, Ex. 4).

The letter cited the "television news report" from the evening before that featured

Jefferson County's accusations of the missing HPRP reports.  Debro's letter then

stated, "I have no evidence that you submitted these reports as required.  I am

therefore dismissing you from your position as coordinator." (Howze Depo. at 195).

Howze disputes that any of her reports to the county were untimely (Howze

Depo. at 160-66), and she considers the county's decision to pull funding as Debro's

"excuse" for terminating her.  (Howze Depo. at 188, 198).  However, she does not

contend that Debro influenced the county's decision to pull funding.  (Howze Depo.

at 199 (Q: "You're not suggesting that Mr. Debro had anything to do with the County

pulling funding, are you?" A: "I'm not suggesting that. I'm saying that it was – it

contributed to his decision. . . . And that it served as an excuse.")).

Howze testified that in her view, Debro's decision to fire her was actually

motivated by her hearing loss, her age, and "because [she] was no longer perfect."

(Howze Depo. at 217).  Based on her conversations with Debro, Howze believed he

harbored a disdain for imperfection.  (Howze Depo. at 200).  She testified that Debro

knew that she had a hearing impairment because she informed him of the impairment

in mid-December of 2009.  Howze has worn a hearing aid on and off since 1996, but

she believes Debro was not aware of her hearing issues until she informed him of

such in December 2009.  (Howze Depo. at 216-17).

At the time she was terminated, Howze was one of five Coordinators in the Community Services Division, who were ages 47, 57, 59, 61 and 66.  All of these Coordinators were under Debro's direct supervision, and he was responsible for each of them being appointed as a Coordinator.  During Howze's employment, there were 100 employees in the division of Community Services, and approximately 25 percent were 60 years of age or older; approximately 25 percent were at or below the age of 30; and approximately 50 percent were between the ages of 30 and 60.  Howze recalled a statement from Debro "that JCCEO could not be charged with age discrimination because everybody was old and they had old people on staff, that the receptionist was over 70 years old, that the coordinators were old."  (Howze Depo. at 171-72).  Debro himself was 67 years of age at the time Howze was terminated.  (Debro Aff. ¶ 23).

The individual who initially replaced Howze as Acting HPRP Coordinator was 40 years of age at the time.  He was subsequently replaced by another individual, who currently serves as HPRP Coordinator, and who was 47 years of age at the time he was hired in that role.  (Debro Aff. ¶ 24).

Other than her termination, no other adverse employment actions were taken against Howze during her JCCEO employment.  (Howze Depo. at 67).  Having

17

worked on grant funded programs all 11 years of her employment, Howze felt JCCEO would have found her a subsequent position should funding cease for any given program.  (Howze Depo. at 244-46).  Before April 13, 2010, Howze never felt that her employment was in jeopardy.  (Howze Aff. ¶ 7).

## IV.   ANALYSIS

### A.  Individual Defendants

Howze only asserts the claim of outrage against the individual Defendants – Lewis, Cunningham, Debro, and Collins. (Complt., Doc. 1 ¶¶ 1, 53-56).[9]  The court agrees with the individual Defendants that Howze has not, and cannot, successfully demonstrate a claim for outrage against them.  As such, these Defendants are entitled to summary judgment and are due to be dismissed from the case.

The court notes that, in her brief opposing the Defendants' Motion for Summary Judgment, Howze fails to respond to any of the specific arguments for summary judgment raised by the individual Defendants.  (*See generally* Doc. 23-1).  Moreover, she fails to counter the legal authorities cited by the Defendants with any legal analysis or citations to any legal authority whatsoever.  (*Id.*).

---

[9]  Presumably, Howze elected not to raise her ADAAA and ADEA discrimination claims against the individual defendants because those claims would not be maintainable as a matter of law.  *See Mason v. Stallings,* 82 F. 3d 1007, 1009 (11th Cir. 1996) ("We hold that the Disabilities Act does not provide for individual liability, only for employer liability."); *Smith v. Lomax*, 45 F. 3d 402, 403 n.4 (11th Cir. 1995) (citing cases that demonstrate there is no individual liability for an alleged violation of the ADEA).

Howze's failure to articulate any arguments in opposition to Defendants'
Motion – much less cite to any evidence in support of her claims – is not without
significant repercussions.  As explained by Judge Steele in *Williams v. Quality
Filters, Inc.*, No. 07-0015-WS-B, 2007 WL 4219201, *1 (S.D. Ala. Nov. 27, 2007):

> Courts are not obligated to read a party's mind or to construct arguments
> that it has failed to raise and that are not reasonably presented in the
> court file. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587,
> 599 (11th Cir. 1995) ("There is no burden upon the district court to
> distill every potential argument that could be made based upon the
> materials before it . . . ."); *see also Higgins v. New Balance Athletic
> Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) (declaring that a "party
> who aspires to oppose a . . . motion must spell out his arguments
> squarely and distinctly, or else forever hold his peace," as district court
> may ignore arguments not adequately developed by nonmovant).
> Clearly, "the onus is upon the parties to formulate arguments."
> *Resolution Trust*, 43 F.3d at 599; *Bowden ex rel. Bowden v. Wal-Mart
> Stores, Inc.*, 124 F. Supp. 2d 1228, 1236 (M.D. Ala. 2000) ("It is not for
> the court to manufacture arguments on Plaintiff's behalf.").
> Accordingly, plaintiff's decision not to respond to the Motion is at her
> peril.

*Williams*, 2007 WL 4219201, *1.  Nevertheless, "[t]he district court cannot base the
entry of summary judgment on the mere fact that the motion was unopposed, but,
rather, must consider the merits of the motion."  *United States v. One Piece of Real
Property*, 363 F.3d 1099, 1101 (11th Cir. 2004).

To establish an outrage claim under Alabama law, a plaintiff must prove that
the conduct at issue was "extreme and outrageous."  *Potts v. Hayes*, 771 So. 2d 462,

465 (Ala. 2000).  The bar for prevailing on an outrage claim is particularly high in

Alabama.  Historically, Alabama courts have only recognized the tort of outrage in

three types of cases.  In *Potts*, the Alabama Supreme Court stated:

> The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, *Whitt v. Hulsey*, 519 So. 2d 901 (Ala.1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989). *See also* Michael L. Roberts and Gregory S. Cusimano, Alabama Tort Law, § 23.0 (2d ed. 1996). In order to recover, a plaintiff must demonstrate that the defendant's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990) (citing *American Road Service Co. v. Inmon*).

*Potts*, 771 So. 2d at 465.

Here, Howze has not argued – much less proven – facts remotely sufficient to

support a claim of outrage against Lewis, Cunningham, Debro, and Collins.  She has

not demonstrated that these individual Defendants have intentionally or recklessly

exhibited "extreme and outrageous" conduct that "caused [her] emotional distress so

severe that no reasonable person could be expected to endure it."  *Id.*  All of Howze's

claims stem from her allegation that she was wrongfully terminated based on a

discriminatory animus.  After discovery, the undisputed evidence demonstrates

20

neither Lewis nor Collins were personally involved in making the decision to terminate her.  Howze even admitted that neither individual discriminated against anyone at JCCEO to her knowledge.  (Howze Depo. at 221 ("Q: Do you have any basis for believing that Reverend Lewis has discriminated against anyone, at any time, for any reason?  A: I have no knowledge, no personal knowledge of his discriminating against anyone at JCCEO."); *id.* at 222 ("Q: What evidence do you have that Ms. Collins has ever discriminated against you or anyone else, on any basis?  A: I have no knowledge of Ms. Collins discriminating against anyone.")).  As for Cunningham[10] and Debro, to the extent that they were personally involved in the decision to terminate Howze, their conduct, viewed in the light most favorable to Howze, still does not rise to the level of extreme and outrageous sufficient to meet the *prima facie* elements for outrage.

Defendants persuasively argue as follows:

A review of Alabama decisions addressing employment cases in this context clearly demonstrates that the facts in this case are grossly insufficient to support this cause of action.  *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1980) (holding that plaintiff's claim that he was accused of being involved in a kickback scheme, his honesty questioned, and he was harassed, investigated without cause, humiliated, accused of improper dealings, treated uncustomarily and ultimately

---

[10]  Howze accuses Cunningham only of "fail[ing] to follow the [JCCEO]'s policy manual by refusing to provide Howze with a termination letter as proscribed by the manual."  (Doc. 23 at 24).

terminated without justification was not sufficient to support the cause of action, as a matter of law); *Whaley v. Sony Magnetic Products, Inc. of America*, 894 F. Supp. 1517 (N.D. Ala. 1995) (dismissing plaintiff's outrage claim based upon allegations of age discrimination in an employment context as "lacking the required degree of egregiousness to warrant sending the tort of outrage claim to the jury"); *Jackson v. Colonial Banking Co.*, 507 So.2d 1310 (Ala. 1987) (holding that plaintiff's claim that his employer harassed and retaliated against him due to his disability was not sufficient to support the cause of action); *Surrency v. Harbison*, 489 So.2d 1097 (Ala. 1986) (holding that plaintiff's claim that his employer harassed him over a period of two years, including threats of physical harm, were insufficient to support the cause of action); *Grantham v. Vanderzyl*, 802 So.2d 1077 (Ala. 2001) (holding that nurse's claim that physician intentionally hit her with a surgical drape exposing her to potential HIV infection and stating "I don't give a damn" was insufficient to support the claim, as a matter of law); *McIsaac v. WZEW-FM Corp.*, 495 So.2d 649 (Ala. 1986) (holding that a plaintiff female employee's claim that she was sexually harassed, propositioned and pursued by the President of her employer and fired, because she would not have sex with him was insufficient to support the cause of action); *Potts v. Hayes*, 771 So.2d 462 (Ala. 2000) (holding that plaintiff's claim that she had been falsely accused of having a drug problem by her employer which resulted in an investigation by the Nursing Board, which brought formal charges against her, and she was not allowed to return to work was insufficient to support the cause of action), and *Thomas v. Williams*, 21 So.3d 1234 (Ala. Civ. App. 2008) (affirming trial court's dismissal of plaintiff's tort of outrage claim on the basis that the defendant had facilitated the plaintiff's termination in retaliation for the plaintiff making a medical malpractice claim).

(Doc. 22 at 23-25).

Thus, as demonstrated by the foregoing cases, Alabama courts do not recognize that age/disability employment discrimination cases of this nature are

sufficient to support a cause of action for intentional infliction of emotional distress or the tort of outrage.  Moreover, Howze has not proven that her resulting emotional distress is "so severe" in nature "that no reasonable person could be expected to endure it." *Potts*, 771 So. 2d at 465; *cf.* Doc. 23 at 13-14 (describing evidence of sleeplessness, crying, headaches, hurt feelings, humiliation, stress, embarrassment, and fear she will not be able to find another job).  In sum, Howze's state law claim for outrage (Count V) fails against the individual Defendants because the facts and allegations do not rise to the level of conduct required to support such claims under Alabama law.

Accordingly, because summary judgment is due to be granted as the only claim asserted against the individual Defendants, Lewis, Cunningham, Debro, and Collins stand to be dismissed from this lawsuit.

**B.  The JCCEO**

Having determined that the JCCEO is the only remaining Defendant, the court addresses Howze's claims against the JCCEO in turn.

### 1.  Disability Discrimination Under the ADAAA

In Count I, Howze brings an ADAAA claim against the JCCEO, alleging that

it intentionally discriminated against her on the basis of her hearing disability.[11]

The ADA Amendments Act of 2008 ("the ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, became effective on January 1, 2009. The conduct made the basis of the Howze's lawsuit occurred after the effective date of the ADAAA because her termination was effected in April 2010. Accordingly, Howze's claim of disability discrimination should not be reviewed under the narrow and restrictive disability standards articulated by the U.S. Supreme Court in *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184 (2002), and *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, (1999). With the passage of the ADAAA, Congress specifically removed the stringent standards previously used to determine whether an individual was a

---

[11] Generally, there are two types of age discrimination claims.

An ADA discrimination claim can be based on either a conventional "disparate treatment" theory, or a theory that the defendant failed to make "reasonable accommodations," or both. Disparate treatment involves discriminatory intent and occurs when a disabled person is singled out for disadvantage because of her disability. By contrast, a failure to make reasonable accommodations claim requires no animus and occurs when a covered entity breaches its affirmative duty to reasonably accommodate the known physical or mental limitations of an otherwise qualified person. This is because the ADA not only protects against disparate treatment, "it also creates an affirmative duty in some circumstances to provide special, preferred treatment, or 'reasonable accommodation.' " *Henrietta D. v. Bloomberg,* 331 F.3d 261, 275–276 (2nd Cir. 2003) (*quoting Dunlap v. Ass'n of Bay Area Gov'ts,* 996 F. Supp. 962, 965 (N.D. Cal.1998)).

*Forbes v. St. Thomas Univ., Inc.,* 768 F. Supp. 2d 1222, 1227 (S.D. Fla. 2010) (emphasis added). In this case, it is clear from Howze's Complaint and summary judgment submissions that her claim is based on disparate treatment. In fact, Howze expressly disclaims requesting any reasonable accommodation for her disability because she "did not feel that [she] needed that." (Howze Depo. at 220).

"qualified individual with a disability." Indeed, the new regulations state that:

> The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA. Consistent with the Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of 'disability' in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA.

29 C.F.R. § 1630.1(c)(4).

The ADAAA amendments, however, do not affect the elements of a plaintiff's *prima facie* case. *See Barlow v. Walgreen Co.*, 8:11-CV-71-T-30EAJ, 2012 WL 868807, at *4 (M.D. Fla. Mar. 14, 2012) ("Despite the changes brought about by the ADAAA, the elements of a plaintiff's *prima facie* case remain the same."). Specifically, a plaintiff still must show that: (1) she is disabled, (2) she was a "qualified individual" at the relevant time, meaning that she could perform the essential functions of the job with or without reasonable accommodations, and (3) she was unlawfully discriminated against because of her disability. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *accord Beatty v. Hudco Indus. Products, Inc.*, 2:10-CV-3051-JHH, 2012 WL 3030100, at *9 (N.D. Ala. July 23, 2012) (evaluating ADAAA claim using the three-point *prima facie* requirement presented in *Lucas*). Further, "[d]espite the changes brought about by the ADAAA, courts still utilize the same *McDonnell Douglas* burden-shifting analysis used in

ADA and Title VII cases." *Beatty*, 2012 WL 3030100, at *6.

The Equal Employment Opportunity Commission ("EEOC") in its regulations implementing the equal employment provisions of the ADAAA defines "disability" with respect to an individual as:

(i)     A physical or mental impairment that substantially limits one or
        more of the major life activities of such individual;

(ii)    A record of such an impairment; or

(iii)   Being regarded as having such an impairment.

29 C.F.R. § 1630.2(g).  Additionally, the definition of disability requires that a person have a physical or mental impairment that substantially limits a major life activity, such as, caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(i).  An individual's impairment must "substantially limit" his or her ability to perform a  major life activity that the average person in the general population can perform; or is significantly restricted as to the condition, manner or duration under which he or she can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform the same major life activity.  29 C.F.R. § 1630.2(j)(1).

In this case, Howze alleges that she has a bilateral hearing loss.  For summary judgment purposes, the court finds that Howze has adequately demonstrated that she

suffers from hearing loss (*see* Doc. 23, Ex. J (medical records evidencing hearing impairments)), which is remedied by her hearing aids to the extent that she can still perform her job duties despite her hearing disability (*see* Howze Depo. at 220 (testifying that she was "able to adequately perform [her] job with the hearing aids")), and that Debro knew of her hearing disability because she informed him of such in December, 2009.  (*See* Howze Depo. at 216 ("Q: How long had Mr. Debro known that you had a hearing impairment? A: I informed him of that in mid December.  Q: Of 2009?  A: Yes.")).  Thus, the court concludes that Howze has satisfied elements one and two of her *prima facie* ADAAA case.

However, Howze has not met the third element of her *prima facie* ADAAA case because she has not established the causal nexus that she was fired in relation to her hearing disability.[12]  Put simply, she has not provided *any* corroborative evidence that demonstrates (directly or circumstantially) that her termination was motivated by her hearing loss.  Howze claims that Debro made multiple comments about generally wanting to surround himself with "young blood" and "new ideas," but she did not claim that Debro or any other JCCEO decisionmaker made any comments demonstrating a discriminatory animus specific to a hearing disability.  Howze's

---

[12]  Because the court finds Howze has not presented a *prima facie* ADAAA case, the court need not engage in the *McDonnell Douglas* burden-shifting analysis.

subjective suspicions that Debro fired her because he learned of her hearing disability is not enough to establish a *prima facie* case of disability discrimination. *Cf. Barlow*, 2012 WL 868807, at *5 (finding that plaintiff's ADAAA claim survived summary judgment where "Plaintiff present[ed] evidence that [her manager] told [her] that she could no longer work for Walgreens <u>because she was disabled</u>, and therefore a liability to Walgreens" (emphasis added)).

Accordingly, summary judgment is due to be granted on Howze's ADAAA claim against the JCCEO because Howze has not *prima facially* established an actionable claim under this count.

### 2.  Age Discrimination Under the ADEA and AADEA

In Count II, Howze brings an age discrimination claim against the JCCEO under the ADEA and AADEA.[13]

The ADEA prohibits an employer from discriminating against an employee

---

[13]  The construction of the AADEA is obviously patterned after that of the ADEA, and the operative language is virtually identical.  As such, Alabama courts have made it expressly clear that  ADEA principles govern in AADEA cases.  *Robinson v. Alabama Central Credit Union*, 946 So.2d 1225, 1228 (Ala. 2007); *Bonham v. Regions Mortgage, Inc.*, 129 F. Supp 2d 1315, 1321 (N.D. Ala. 2001).  Furthermore, <u>Ala. Code</u> § 25-1-29 expressly states: ". . .any employment practice authorized by the Federal Age Discrimination in Employment Act shall also be authorized by this article in the remedies, defenses and statute of limitations under the article shall be the same as those authorized by the Federal Age Discrimination in Employment Act except that a plaintiff shall not be required to pursue any administrative action or remedy prior to filing suit under this article."  Therefore, the court will analyze Howze's age discrimination claims together under the ADEA.

who is over forty years old "because of" her age.  29 U.S.C. §§ 623(a)(1), 631(a).  A plaintiff can establish a *prima facie* case of age discrimination through either direct or circumstantial evidence.  *Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010).  Direct evidence consists of "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age."  *Van Voorhis v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (quotation marks omitted).  Evidence that merely suggests a discriminatory motive is, by definition, circumstantial evidence.  *Burrell v. Bd. of Tr. of Ga. Military Coll.*, 125 F.3d 1390, 1393–94 (11th Cir. 1997).[14]

To prove her *prima facie* case of age discrimination under the ADEA and AADEA, Howze must prove that: (1) she was a member of a protected group, (2) she was discharged, (3) she was replaced with a person outside the protected group, and (4) she was qualified to do her job.  *Stanfield v. Answering Service, Inc.*, 867 F.2d 1290 (11th Cir. 1989); *Lambert v. Mazer,* 33 So.3d 18 (Ala. Civ. App. 2009).

In this case, the JCCEO strongly argues that "the undisputed evidence overwhelmingly demonstrates that Howze cannot put forth even a *prima facie* case."

---

[14]  In this case, Howze presents only circumstantial evidence of age discrimination.  The comments by Debro complaining that JCCEO staff were too "old" and that he wanted to surround himself with "young blood" and "new ideas" are enough for a reasonable juror to infer a discriminatory animus in terminating Howze for her age, but his statements are not enough to constitute direct evidence that he specifically intended to fire her for her age.

(Doc. 22 at 16).  The court disagrees, finding that Howze has sufficiently presented a *prima facie* case, and, further, there are sufficient genuine issues of material fact for a reasonable juror to find in favor of either party on the issue of pretext.

As to the *prima facie* elements, Howze is clearly a member of the protected group as she was age 57 at her termination.  There is also no dispute that she was terminated.  She was replaced by employees who, even though they were both 40 years of age or older, were 10 and 17 years younger than Howze, and the Eleventh Circuit has held that an age difference as little as 3 years is "substantially younger." *See Carter v. Decision One Corp. Through CT Corp.*, 122 F. 3d 997 (11th Cir. 1997) (explaining that the Eleventh Circuit has found a three-year age difference to be "legally significant for ADEA purposes"); *see also Carter v. City of Miami*, 870 F.2d 578, 582-83 (11th Cir. 1989) (finding that a *prima facie* ADEA case was established when a 49-year-old  plaintiff was replaced by a 46-year-old woman).  Thus, the court can readily conclude that the third element of Howze's *prima facie* case is met.

The JCCEO disputes the fourth element: that Howze was qualified to do her job.  However, viewing the facts in the light most favorable to Howze, the court finds that she has presented evidence for a reasonable juror to conclude that she was qualified for the job.  According to Howze's deposition testimony and supporting evidence, she was working diligently to meet the requirements of a newly created

position that was experiencing transitionary obstacles and miscommunications beyond her control.  Moreover, she presented evidence that her supervisor, Debro, was aware of certain factors affecting the HPRP's productivity beyond Howze's control.  (*See, e.g.,* Doc.23, Ex. F (e-mail between Debro and MBSH's executive director discussing communications breakdowns and MBSH's failure to provide timely reports to the HPRP)).  Howze also testified that she never received a complaint about her work until the week before her termination. Also, as to her academic qualifications, there appears to be no dispute that she had the requisite degrees and educational background to qualify (if not over qualify) for the position. As to experience, that qualification would be difficult to measure, given the new nature of the position.

Assuming that Howze has demonstrated a *prima facie* case, the court turns to the burden-shifting framework.  The court easily finds that the JCCEO has articulated a legitimate nondiscriminatory reason justifying Howze's termination based on its April 13, 2010, letter addressing three perceived inadequacies in Howze's job performance, followed by its April 22, 2010, letter informing Howze that her position was being terminated because of Jefferson County's announcement about dropping its funding based on missing reports.  Thus, the burden shifts back to Howze to establish sufficient evidence of pretext. *McDonnell Douglas*, 411 U.S. at 802-05.

As to pretext, the court finds that Howze has presented sufficient evidence for a reasonable juror to conclude that age discrimination was the actual ("but-for") reason for Debro's decision to terminate Howze. *See Gross*, 129 S. Ct. at 2352.[15] Given Debro's multiple complaints to Howze about the age of JCCEO's employees; his repeated desire to introduce "young blood" and "new ideas" into the agency; his decision to move three "old" employees out of his building to other buildings; and Howze's clean track record of working for the JCCEO for eleven years without the types of complaints about her job performance that were cited in the sudden decision to terminate her, a reasonable juror could conclude that Howze is correct in saying that the county's withdrawal of its funding was nothing more than a convenient

---

[15]  The JCCEO makes much ado over the statement of Howze's counsel in her brief in opposition to summary judgment that

> Howze was a double liability.  She was old and she was disable[d].  Howze might have survived had she been a member of only one of the protected classes however, by being a member of both protected classes, Cunningham and Debro wanted her gone and they used the termination of the Agency's HPRP contract by the County as a cover for their actions.

(Doc. 23-1 at 20).  The JCCEO argues that this "admission" of double liability is fatal to Howze's age claim because of the *Gross* "but-for" standard.  (Doc. 22 at 17-20).  However, statements of counsel are not evidence.  *United States v. Jacoby*, 955 F.2d 1527, 1541 (11th Cir.1992) (recognizing that "statements of counsel are not evidence").  Moreover, the undersigned interprets *Gross* to still allow for pleading of alternative theories, even up to the point of trial.  *See  Goodridge v. Siemens Energy, Inc.*, No. 4:11–CV–240–VEH, 2011 WL 4552504, at *2 & n.1 (N.D. Ala. Sept. 28, 2011).  Finally, the "but-for" issue is effectively rendered moot in light of the court's decision to grant summary judgment on Howze's disability discrimination claim.

"excuse" to terminate her for another reason—to usher out the "old" and make room for "young blood" in the organization.

"The resolution of this case depends on whose account of the pertinent conversations a jury would credit." *Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010). Considering the facts in the light most favorable to Howze for the purposes of summary judgment, the court concludes that the record contains "'evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions.'" *See MacPherson v. University of Montevallo*, 922 F.2d 766, 776 (11th Cir. 1991) (quoting *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041,1045 (11th Cir. 1998)). More particularly, as to pretext, "[t]he evidence presented by plaintiff[] is sufficient to allow a jury in the exercise of impartial judgment to conclude that [the JCCEO's] proffered explanations are unworthy of belief." *MacPherson*, 922 F.2d at 776; *see also Mora*, 597 F.3d at 1204 ("We conclude that a reasonable juror could accept that [the decisionmaker] made the discriminatory-sounding remarks and that the remarks are sufficient evidence of a discriminatory motive which was the 'but for' cause of Plaintiff's dismissal."). Alternatively, a reasonable jury could equally conclude that the JCCEO's articulated reasons for firing Howze are legitimate and not a pretext for discrimination under the ADEA or the AADEA.

Therefore, because material factual disputes preclude the entry of summary judgment as to Howze's ADEA and AADEA claims against the JCCEO, summary judgment on those claims is due to be denied.

### 3.  State Law Claims

#### a)  Outrage and Intentional Infliction of Emotional Distress ("IIED")[16]

The court finds for the same reasons discussed *supra* in Section IV.A. that summary judgment is due to be granted on Howze's outrage (Count V) and IIED claim (Count III) against the JCCEO.  In short, Howze has not presented facts or evidence that rise to the level of extreme or outrageous conduct required under Alabama law.  *See Potts*, 771 So. 2d at 465.  The facts of this are not anywhere near the level of the facts presented in the three categories of cases in which the tort of outrage has been recognized in Alabama.  *See id.*  Moreover, Howze's asserted emotional distress is not "so severe" in nature "that no reasonable person could be

---

[16]  Both parties in their briefing treat the torts of outrage and IIED together.  Indeed, case law in Alabama supports the conclusion that these torts are treated the same.  *See, e.g., Wal-Mart Stores, Inc. v. Smitherman*, 872 So.2d 833, 836 (Ala. 2003) (noting in *dicta* that claim for intentional infliction of emotional distress is really a claim for tort of outrage); *Harrelson v. R.J.*, 882 So.2d 317, 321 (Ala. 2003) (describing plaintiff's claim as one for "intentional infliction of emotional distress, i.e., the tort of outrage").  In fact, Judge Steele of the Southern District of Alabama has gone so far as to hold that the two torts are synonymous, and thus, redundant.  *See Lees v. Sea Breeze Health Care Ctr., Inc*., 391 F. Supp. 2d 1103, 1105-06 (S.D. Ala. 2005) (Steele, J.) (collapsing claims for IIED and outrage under Alabama law into a single cause of action for outrage, and dismissing plaintiff's claim for IIED "as duplicative").  Therefore, it is appropriate for the court to analyze Howze's Plaintiff's claim for outrage and for IIED together under the legal standards for outrage.

expected to endure it." *Compare Potts*, 771 So. 2d at 465, *with* Doc. 23 at 13-14.

Accordingly, Howze's outrage/IIED claims against the JCCEO are due to be

dismissed.

### b)  Negligent Hiring, Training, Supervision, and Retention

Lastly, the JCCEO argues that Howze's claims against it for negligent hiring,

training, supervision and retention (Count IV) fail as a matter of law because the

claims lack sufficient legal and factual support.  The court agrees.

In a very analogous case where a federal court has addressed similar Alabama

tort claims in an employment discrimination case, the court summarily dismissed

plaintiff's claims of negligent training, supervision, and retention.  In *Norman v. So.

Guarantee Ins. Co.*, 191 F. Supp. 2d 1321 (N.D. Ala. 2002), Judge Thompson

persuasively dismissed such claims in the context of an FMLA and ADA case.  In

finding the plaintiff's allegations insufficient, Judge Thompson stated:

> The claims of negligent training, supervision, and retention, in
> addition, would also deserve to be dismissed on their merits. Alabama
> recognized a cause of action for negligent training or supervision in
> *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1002–03 (Ala. 1993).
> According to that court, "liability depends upon its being established
> by affirmative proof that such incompetency was actually known by
> the master or that, had he exercised due and proper diligence, he would
> have learned that which would charge him in the law with such
> knowledge." *Id.* at 1003 (quoting *Lane v. Central Bank of Alabama,
> N.A.*, 425 So.2d 1098, 1100 (Ala. 1983)). Evidence of this actual or
> constructive knowledge may consist of specific acts of incompetency

brought to the master's attention or a pattern of incompetent acts such that the character, frequency, and seriousness of the acts must have brought the incompetency to the master's attention in the exercise of due care. *Id*. A plaintiff must also show that the above breach of the employer's duty to reasonably supervise his or her employees proximately caused the plaintiff's injury. *Keel v. Banach*, 624 So. 2d 1022, 1026 (Ala. 1993) (stating that there are four elements of negligence in Alabama: (1) a duty; (2) breach of the duty; (3) proximate cause; and (4) injury arising therefrom).

Based on this view of the alleged wrongs, for a negligent supervision and training claim to exist regarding these alleged failures, Southern Guaranty must or should have known *not* of its employees' propensity to misapply the FMLA or ADA, but rather of their propensity to *intentionally discriminate or retaliate* against an employee taking advantage of the protections of those statutes. Norman has not alleged a continuing pattern of violations, nor, indeed, any prior discrimination or retaliation, such that the company should have been aware of the problem. Even if there was evidence that would put Southern Guaranty on notice, there is no proof that the negligent training and supervision caused the injuries in this case.

For substantially similar reasons, summary judgment should also be entered on the negligent retention claim. An employer "must use due care to avoid the ... retention of an employee whom [the employer] knows or should know is a person unworthy, by habits, temperament, or nature, to deal with the persons [he will be in contact with during his employment]." *Brown v. Vanity Fair Mills*, 291 Ala. 80, 277 So.2d 893, 894 (1973). To recover for negligent retention in Alabama, a plaintiff must show breach of the employer's above duty and that such breach proximately caused the plaintiff's injury. *Id*. There is no evidence of such actual or constructive knowledge, nor is there an adequate causal link between this alleged breach and the injury.

*Norman*, 191 F. Supp. at 1337 (italics in original; underline added) (footnote omitted).

The court finds the reasoning of *Norman* highly persuasive and analogous to this case. Similarly to *Norman*, in this case there is neither sufficient evidence to support these causes of action, "nor is there an adequate causal link between this alleged breach and the injury." *See id.* Howze's claim is premised on a theory that Debro terminated her for several reasons, some of which are legally impermissible. The evidence affirmatively establishes that the JCCEO had a well known and publicized policy prohibiting any illegal discriminatory conduct by any of its employees. In her deposition, Howze acknowledged that Debro was well aware of the applicable anti-discrimination laws. As such, there is clearly no failure on the part of JCCEO or the other individual defendants to train or educate Debro. Further, there is no evidence that Cunningham or Debro demonstrated a pattern of discriminatory conduct. As such, the claims asserted in Count IV fail, as a matter of law.

## V.    CONCLUSION

Accordingly, for the reasons stated above, the Defendants' Motion for Summary Judgment is due to be granted in part and denied in part as set out above. A separate order will be entered consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this the 28th day of August, 2012.

**VIRGINIA EMERSON HOPKINS**
United States District Judge